THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
HOWARD JONES, Appellant.

First Department, June 19, 1986

## APPEARANCES OF COUNSEL

*David Samel* of counsel *(Philip L. Weinstein,* attorney), for appellant.

*Richard E. Haftel* of counsel *(Peter D. Coddington* with him on the brief; *Mario Merola, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

SULLIVAN, J.

Convicted of robbery in the first degree and sentenced as a persistent violent felony offender to 25 years to life, defendant seeks reversal and a new trial because of, *inter alia,* the allegedly improper admission in evidence of testimony regarding a woman's skirt he was carrying when first encountered by police officers shortly after the robbery had occurred, as well as Trial Term's refusal to suppress a blue jacket taken from him at the station house after his warrantless arrest at his apartment. Although we find that this evidence was properly received, we also conclude that if error were committed it was harmless even under the standard applied to constitutional error, since there is no reasonable possibility that its admission contributed to the conviction in view of the overwhelming proof of guilt. *(See, Chapman v California,* 386 US 18; *People v Crimmins,* 36 NY2d 230.)

The following account, which, except for defendant's testimony and the evidence of the victim's identification of his photograph, was repeated at trial, is derived from the record of the suppression hearing. On October 9, 1982, at 5:46 A.M., Officers Watson and O'Laughlin, on radio motor patrol, received a report that two Hispanic males were stripping an automobile in front of 600 Baychester Avenue, one of the buildings within the Co-op City area housing complex. They responded within minutes and observed defendant, a tall,

heavy black man, who did not fit the description of either suspect, running from the entrance of 600 Baychester Avenue with something in his hand. Thinking that defendant might have been the victim of a crime, O'Laughlin shouted at him to stop. Defendant responded by accelerating his pace and dropping the object he was carrying. The officers exited their car and gave chase, with Officer Watson stopping to retrieve the object dropped by defendant, a skirt with two holes in it and a stain. O'Laughlin caught up to defendant and stopped him by threatening the use of his nightstick, while Watson, who assisted, drew his gun and ordered defendant to raise his hands. In response to the officers' inquiries as to why he had dropped the skirt and run, defendant denied doing either. He told them that he was returning home from Harlem, where he had been gambling. At this point the officers observed a fresh cut on one of defendant's knuckles. He explained that he had cut his hand earlier that day while working. After again denying that he had dropped the skirt, defendant was handcuffed and taken back to the patrol car.

After the arrival of the officers' supervisor, Sergeant Hunt, he and O'Laughlin, believing that defendant had recently committed a crime, went into 600 Baychester Avenue to look "for a victim". They found fresh blood on the floor of one of the elevators, but no victim, and spoke to two men who had heard a woman's screams. After canvassing the building without any success, O'Laughlin dialed the telephone number which defendant had given and spoke to his girlfriend, who verified his name and address, but said that he had been home all night up until an hour earlier. Defendant was then released.

Later, while Officers Watson and O'Laughlin were completing the required police forms at the station house, they overheard another officer talking on the telephone to someone reporting a crime at 600 Baychester Avenue. Watson took the telephone and spoke to Allison Brown, who told him that she had been robbed and assaulted at a time which, he calculated, coincided with the officers' observation of defendant running from the building. She described her assailant as a six-foot three-inch black man weighing approximately 260 to 280 pounds and wearing a blue jacket and pants. After speaking further to Brown at her apartment, Officers Watson and O'Laughlin, Sergeant Hunt, and two other officers proceeded to defendant's apartment at 100 Alcott Place, also in Co-op City. Hunt, who did not testify at the suppression hearing,

knocked on the door, identified himself as a police officer and spoke to defendant, who, by saying, "Okay, come in" or words to that effect, indicated that the officers could enter. They did and arrested defendant, who was taken to the station house and photographed. That same day, Ms. Brown identified defendant's photograph from an array as the man who attacked her in the elevator. One month later she also identified him in a lineup.

Defendant testified, limiting his narrative to his arrest in his apartment. He had been lying in bed when he heard a knock on the door. He opened it and identified himself to the officers outside. When he turned away to comply with Sergeant Hunt's request to turn on the lights, Hunt walked into the apartment. Watson and O'Laughlin also entered, and told him they were arresting him. When defendant went to his bedroom to get dressed, Officer Watson followed him in and told him to put on the same clothes, including the blue jacket he had worn earlier. The jacket was later taken from him at the station house and vouchered.

At the close of the suppression hearing, defendant argued that the police officers' initial stop of him, just because he was running, was improper. Thus, he claimed, his false denial of possession of the skirt could not justify the stop, which had already occurred. In any event, he added, that statement had to be suppressed as the product of questioning which had not been preceded by the administration of the *Miranda* warnings. Defendant also claimed that his warrantless arrest in his home was improper since exigent circumstances had not been shown and consent had not been given. Thus, he claimed, the blue jacket should also be suppressed as the fruit of that constitutional violation.

The court denied the motion to suppress in its entirety. Crediting the officers' testimony, it found that once they observed the running defendant accelerate his pace and discard the skirt in response to their command to stop "[they] had 'reasonable suspicion' for their pursuit of [him]", and that after their retrieval of the skirt, they had justification for a "limited inquiry". Moreover, the *Miranda* warnings were not required, because "defendant was not in custody but merely being detained for the sole purpose of inquiring into his suspicious conduct." The court rejected defendant's testimony and found his arrest lawful since he had knowingly and voluntarily consented to the officers' entry into his home.

The court also ruled, on the People's motion *in limine,* that it would permit them to offer, as evidence of consciousness of guilt, testimony regarding the skirt. It would not, however, permit the skirt itself to be admitted as physical evidence because of its "highly prejudicial" nature.

At the trial, Ms. Brown, an administrative assistant at an advertising agency and evening student at Hunter College, testified that on Friday evening, October 8, 1982, she accompanied her boyfriend to a discotheque. They left after a few hours and went to his apartment, where she stayed until about 5:00 A.M., when she summoned a taxicab and returned to her home at 600 Baychester Avenue.

Earlier, at about 4:30 A.M., Police Officers Barbara Bourne and Gloria Brown, who were attempting to notify a resident of 600 Baychester Avenue that someone had broken into his car, had observed defendant in the lobby of that building. He had opened the door for them with his key. The officers went about their business and did not see him again.

As Ms. Brown waited for the elevator in the brightly lit lobby of her building at about 5:45 A.M., she observed defendant, "a very big guy" wearing a blue jacket, a white shirt and blue pants, enter the building. He "looked like an out-of-shape football player [with] a big pot belly". As he stood within two feet of her, she noticed that he had a mustache. When an elevator finally came, Ms. Brown entered, pressed the button for the thirteenth floor and stood in the back of the well-lighted car. Defendant entered, pressed the third-floor button, and stood directly in front of her facing the door.

When the elevator reached the third floor, defendant suddenly turned around and punched her in the face, causing her to fall, unconscious, to the floor. When she regained consciousness, she was covered with blood. Her purse, which had contained about $14, was missing. Unable to summon help, she went to her apartment, and was eventually taken to Montefiore Hospital where it was determined that she had suffered a fractured left cheekbone requiring surgery and the placement of permanent wires in her jaw. Ms. Brown also suffered a cut eyebrow, a black eye and some chipped teeth. She still suffers from chronic pain in the left side of her face when it rains or any pressure is exerted in that area. Sometime after the crime, Ms. Brown discovered that the key to her apartment building opened the front door to 4 of the 5 buildings in her section of Co-op City, including defendant's.

Defendant called two witnesses. One, a Pathmark Supermarket employee, testified that on October 6, 1982, three days before the robbery, defendant filled out an accident report which indicated that he had injured his thumb. The other, a Co-op City security officer, testified that his report of the incident described the perpetrator as a five-foot nine-inch man weighing 215 pounds, a description that Ms. Brown denied ever giving. Although the officer recalled speaking to her on the day of the incident, he could not remember her description of the assailant. He stated that when he conducts an interview he often asks the witnesses to compare the perpetrator to someone nearby.

It is hardly surprising, on the basis of such evidence, that defendant was convicted. Ms. Brown's identification testimony alone provided overwhelming evidence of guilt. She had more than ample opportunity to observe the six-foot three-inch, 260-pound defendant in a deserted but well-illuminated lobby. Finding herself alone in the early hours of the morning, she apprehensively studied his every move, noting that he had entered her building with a key and that he pressed the third-floor button on the elevator. The concern which prompted Ms. Brown to study defendant so carefully before he turned and knocked her unconscious enabled her to remember not only his bulk but also that he was wearing a blue jacket and pants. Thus, Ms. Brown's opportunity to observe defendant and the details of her description provided the jury with strong evidence of guilt.

Moreover, Ms. Brown's identification testimony was corroborated by circumstantial evidence. The two different sets of police officers observed defendant at the crime scene, both before and immediately after the robbery. Ms. Brown's observation of defendant using a key to enter her building curiously matched that of Police Officers Bourne and Brown, who, earlier that morning, saw him use a key to enter the same building, in which he did not reside. Similarly, the officers' observation of defendant running from the building immediately after the crime further corroborated her testimony. The fresh cut on his knuckles was also consistent with Ms. Brown's testimony that the perpetrator knocked out some of her teeth. Finally, that defendant, a man of noticeably distinct physical stature, was attired in the precise clothing Ms. Brown said that her assailant was wearing, and that he lived in a neighboring building, the front door to which could be opened by the same key as opened the front door of Ms.

Brown's building, serves to render the jury's verdict unassailable, even absent the evidence defendant alleges was improperly introduced.

In any event, the suppression court properly found that the police officers were justified in stopping and seizing defendant eliciting his name, address and explanation of his whereabouts without first giving him the *Miranda* warnings and, in light of his consent to their entry into his home, in subsequently arresting him there.

The initial encounter between defendant and Officers Watson and O'Laughlin came when, at 6:00 in the morning, they observed him, unknown object in his hand, running from the lobby of a building where two men were standing. When the officers asked defendant to stop, which they had the right to do since, in believing that he might have been a crime victim, they had an objective, credible reason for approaching him to ask for information *(see, People v De Bour,* 40 NY2d 210, 223; *cf. People v Howard,* 50 NY2d 583), he began to run faster and then disposed of the object he was carrying, hardly the actions of an early morning jogger or a harried commuter. Thus, while at the outset the officers could do no more than approach defendant to request information, a request he could concededly ignore *(People v Howard,* 50 NY2d, at p 586), his subsequent actions became more suspicious and raised the level of permissible police intrusion.

Unlike *Howard (supra)* where the defendant's abandonment of a bag he was carrying was compelled by the police officers' illegal pursuit of him, here, defendant dropped the skirt as soon as the police requested him to stop. Only then did the officers give chase. Nor did they handcuff defendant until they discovered that the object he discarded was a woman's skirt with holes in it. Thus, this case is more readily analogous to *People v Medina* (107 AD2d 303), where the defendants dropped stolen articles they had been carrying as soon as two undercover officers identified themselves. As the court there found, the officers were exercising their common-law right of inquiry and not acting in a threatening manner when they first approached. Thus, the stolen property was abandoned before any arrest occurred. That is precisely the situation here.

Defendant argues that even if the police had a right to stop him, they were required to give him the *Miranda* warnings before questioning him about the skirt or his activities that

morning. Questions asked of a suspect in an ongoing criminal investigation that are designed to clarify the situation rather than to coerce a statement are not considered part of the interrogation process to which *Miranda v Arizona* (384 US 436) is applicable. *(People v Huffman,* 41 NY2d 29, 34.) Such was the case here. Alerted to the possibility that a crime had been committed, the officers were entitled to question defendant, whose conduct had generated a reasonable suspicion warranting his detention for further investigation. We are unaware of any constitutional requirement that every investigatory inquiry must be prefaced by the *Miranda* warnings.

Aside from his argument that the skirt should have been suppressed as part of the "fruits" of a constitutional violation, defendant also maintains that the trial court abused its discretion, even though it refused to admit the skirt in evidence, by permitting testimony, over objection, that, while being pursued by the police, he dropped the skirt, and later denied doing so when confronted by the officers who had witnessed his actions. In our view, the probative impact of defendant's evasive actions in disposing of the skirt outweighed any possible extrinsic prejudice from the introduction of such testimony.

Defendant suggests that his behavior in discarding the skirt in response to a police confrontation was not probative since the skirt was never connected to the robbery. Although a nexus was never established, evidence of defendant's flight from the victim's apartment house within minutes of the crime was, in any event, relevant on the question of guilt, as were his false denials about discarding the skirt. The relevancy of the latter piece of evidence is, of course, limited to consciousness of guilt, admittedly a probatively weak species of evidence. *(People v Moses,* 63 NY2d 299, 308.) Like all circumstantial evidence, it is, by itself, insufficient to sustain a conviction unless it is inconsistent with every reasonable hypothesis but guilt. *(People v Gates,* 24 NY2d 666, 669; *People v Wachowicz,* 22 NY2d 369, 372.) Its admissibility, however, is not subject to any such restriction. All that need be shown is that the evidence is relevant, that is, "that it tend[s] to convince that the fact sought to be established is so". *(People v Yazum,* 13 NY2d 302, 304.) "That it is equivocal or that it is consistent with suppositions other than guilt does not render it inadmissible" *(supra,* p 304, citing 1 Wigmore, Evidence §§ 31, 32 [3d ed]). Nor is there any requirement that the evidence offered to demonstrate a consciousness of guilt be

referrable only to the crime charged. *(See, People v Moses,* 63 NY2d, at p 308; *see also, People v Yazum,* 13 NY2d, at p 304.) In any event, the People had a right to produce evidence justifying the officers' conduct in chasing defendant, since they were responding to a radio report of automobile stripping, not robbery. In this regard, it should be noted, defense counsel, in effect, argued in summation that defendant was stopped solely because he was a black man. Thus, defendant's flight from the building with something in his hands, which turned out to be a skirt with two holes in it, was an integral part of the narrative.

The situation here is distinguishable from this court's decision in *People v Rivera* (88 AD2d 892 [as police officers approached defendant, who had just been pointed out to them as a perpetrator of a robbery that had occurred within past 5 to 10 minutes, he threw away a bag, which, when retrieved, contained a watch that was not the victim's. Held: error to allow evidence of bag throwing incident, even though jury told to disregard the testimony that the bag contained a watch]), upon which the dissent relies, since it was not defendant's possession of the skirt or even his discarding of it that was used as evidence of guilt, but rather his false denial that he had thrown it away. Thus, unlike *Rivera,* the so-called uncharged crime was not, itself, offered as evidence of guilt. Trial Term was quite explicit in that regard, ruling that the testimony about the skirt was part and parcel of defendant's false disclaimers, which were sufficient to suggest a consciousness of guilt. Thus, the testimony about the skirt was relevant to show that defendant, fleeing from the crime scene, gave a false answer to a legitimate police inquiry.

Moreover, any prejudice from the testimony concerning the skirt was de minimis. No evidence was adduced connecting it to any other crime; nor should we necessarily conclude that the jury might have speculated that defendant was involved in some other criminal activity that morning. It should be noted that Officer Watson's testimony that he initially suspected that defendant may have raped someone was brought out on cross-examination. Although Trial Term should have charged the jury, as requested, on the weakness of evidence of consciousness of guilt, any error was rendered harmless by the overwhelming proof of guilt. Clearly, Ms. Brown's positive in-court and pretrial lineup identification of defendant and her opportunity to observe his distinct features, corroborated by

defendant's false tales of his whereabouts that evening, permitted the jury no choice but to convict.

Defendant also argues that the blue jacket recovered should have been suppressed as the product of an unlawful arrest because the police illegally entered his home to arrest him. Absent exigent circumstances or consent, a warrantless entry into the home for the purpose of effectuating an arrest is constitutionally proscribed. *(Payton v New York,* 445 US 573.) Since, however, as the suppression court found, defendant consented to the officers' entry, their warrantless entry into his home was proper. Contrary to defendant's argument, the People did satisfy the "heavy burden" imposed on them of showing that he voluntarily consented to their entry *(cf. People v Dodt,* 61 NY2d 408, 417; *People v Gonzalez,* 39 NY2d 122, 128). Although not totally dispositive, an important factor in determining whether consent is voluntarily given is whether the defendant is in custody at the time consent had been given *(supra,* at p 129). Here, defendant was in his own apartment when the police asked to speak with him. No threats were made. The officers did not have their guns drawn. Nor is it likely that defendant, who had already that morning issued false statements to the police, would be susceptible to having his will overborne. Indeed, it appears that defendant's answer, "Okay, come in", in response to Sergeant Hunt's inquiry was more likely the product of calculation than awe. Having already been released once by the same officers, he, no doubt, had every reason to believe that he could talk his way out of another confrontation by conversing with them. While the People would have been better served if Sergeant Hunt had testified at the suppression hearing, his absence is only one factor for this court to consider. And although the People's evidence was flatly contradicted by defendant, the suppression court found him to be unworthy of belief. On such evidence, even without Sergeant Hunt's testimony, we cannot conclude that the suppression court's finding of consent was not factually supported. Thus, the court properly denied suppression of the blue jacket.

In any event, even if error was committed in admitting the jacket, such error was harmless in light of the People's proof. Officers Watson and O'Laughlin testified that defendant was wearing a blue jacket and pants at the time they observed him running from Ms. Brown's apartment building, thus confirming that defendant was wearing a blue jacket at about

the time of the robbery. That basically was the function of offering the jacket in evidence.

We have considered defendant's other contentions and find that they are without merit.

Accordingly, the judgment of the Supreme Court, Bronx County (George D. Covington, J.), rendered February 16, 1984, convicting defendant of robbery in the first degree and sentencing him as a persistent violent felony offender to an indeterminate term of imprisonment of from 25 years to life should be affirmed.

CARRO, J. (dissenting). On the morning of October 9, 1982, at about 4:30 A.M., Police Officers Gloria Brown and Barbara Bourne responded to 600 Baychester Avenue in Co-op City in The Bronx, to investigate a burglarized car. A tall, heavy black man let them into the building. Bourne identified the man as defendant, while Brown said she thought it was defendant. Later that morning, at about 5:55 A.M., Allison Brown entered her building at 600 Baychester Avenue. As she waited for the elevator, she saw a very big black man enter the building through the locked front door. The man wore a dark blue jacket, white polo shirt and blue pants and carried a dark brown or black overnight bag. She described the jacket as a "coach's jacket" with snaps and a drawstring. She said the man was tall, weighed about 220 pounds, and had a mustache.

When the elevator arrived, both entered. Brown pressed the button for the thirteenth floor, and the man pressed three. Before the elevator reached the third floor, the man punched Brown on the left side of her face, knocking her unconscious. She awoke sometime later and was still in the elevator which had reached the thirteenth floor. Her face was bloodied and she felt pieces of teeth in her mouth. Brown entered her apartment and realized that her purse, which contained $14, was missing. She never saw the man take the purse. She then proceeded to contact the Co-op City security patrol and the New York City Police. Detective Drum, the Co-op City security officer, testified that Brown described her assailant as being five-feet nine-inches tall and weighing 215 pounds.

Shortly before 6:00 A.M. on that same morning, Officers Kevin Watson and Brian O'Laughlin were responding to a report of two Hispanic males stripping an automobile in Co-op City and were driving by 600 Baychester Avenue looking at the parked cars. They saw defendant running alongside 600

Baychester Avenue. He was dressed in a dark blue jacket and dark blue pants. The two officers exited their car and Watson yelled either "stop" or "stop, police". At the same time, the officers had begun to run after defendant. Defendant turned, looked at the officers and then ran faster, dropping an object along the way. The officers continued running after defendant. Watson picked up the object the man dropped, a skirt with two holes and a white stain. O'Laughlin in the meantime had reached defendant and raised his nightstick to stop him. Watson then approached, drew his gun and told appellant to raise his hands. They questioned defendant as to why he ran and why he dropped the skirt. Defendant denied that the skirt was his or that he dropped it. The officers noticed a cut on one knuckle of defendant's hand. Defendant was handcuffed and brought back to the patrol car. The officers then used their radio to request the assistance of a sergeant.

After Sergeant Hunt responded both he and O'Laughlin entered 600 Baychester Avenue to look for a victim. They found blood on the floor of an elevator. Two men in the building told the officers that they had heard a woman's screams but had not been able to find anyone. The officers searched the building but found no victim.

The officers then obtained defendant's name, address and telephone number and after making a call to verify this information released defendant. At no time did the officers see a woman's purse or an overnight bag on defendant or near him.

Watson and O'Laughlin returned to the precinct to fill out a stop and frisk form when they overheard another officer talking on the phone to a person reporting a crime at 600 Baychester Avenue. Watson took the phone and spoke to Allison Brown who said she had been robbed and assaulted by a big black man wearing a blue jacket and blue pants.

After speaking with Brown in person, Watson, O'Laughlin, Sergeant Hunt and two other officers went to defendant's apartment at about 7:00 A.M. Only Officers Watson and O'Laughlin, however, testified at the combined *Huntley, Mapp* and *Wade* hearing concerning the circumstances of the arrest which followed. Hunt was the one who knocked on the door and spoke to defendant. O'Laughlin could not hear anything that was being said. Watson testified that Hunt identified himself as a police officer and defendant opened the door. Watson also said that defendant somehow indicated that the

officers could come in, but he could not recall exactly how defendant indicated that. The officers entered the apartment without guns drawn. However, it is admitted that their intent was to question and arrest defendant. Once the officers entered, defendant was arrested and told to get dressed. The officers had no arrest or search warrant.

At the suppression hearing, defendant testified that he had been lying in bed when he heard a knock on the door. He opened the door and Sergeant Hunt asked if he was Howard Jones and if anyone else was present. Defendant identified himself and said that his children were home. Hunt asked defendant to turn on a light. As defendant returned to do so, Hunt walked into the apartment. Watson and O'Laughlin entered close behind and told him that they were arresting him. Defendant denied ever having invited the officers in. Defendant got dressed in the same blue jacket and pants he wore earlier. Watson vouchered the blue zippered jacket which, contrary to Brown's recollection, had no snaps. The jacket was introduced into evidence at trial.

Later that day, Allison Brown identified defendant as the robber from a photo array shown to her while she was in the hospital. On November 4, 1982, she viewed a lineup and identified defendant. At his arrest, defendant measured six feet, three inches and weighed 260 pounds.

At the conclusion of the suppression hearing, the court denied defendant's motion to suppress in its entirety. Regarding his arrest, the court found that defendant had voluntarily admitted the officers into his apartment and thus consented to the warrantless arrest. As to the seizure of the skirt and the admissibility of the statements defendant made during the officers' first encounter with him outside 600 Baychester Avenue, the court concluded that the stop was based on reasonable suspicion which justified a limited inquiry and denied suppression. The court also denied the motion to suppress the identification evidence, concluding that the photo array and lineup were not suggestive and an independent source existed for Brown's identification of the defendant.

At trial, the District Attorney, over defense counsel's vigorous objections was permitted to introduce testimony concerning the initial stop of defendant and the discarded skirt, under the theory of consciousness of guilt, although the skirt itself was not introduced into evidence. The skirt, however, concededly bore no relationship to the crime charged. The court also

refused to give a charge concerning the weak probative value of consciousness of guilt evidence. As part of his defense, defendant introduced an accident report from work which showed that he had suffered an injury to his thumb on October 6, 1982.

After trial on February 16, 1984, defendant was convicted of robbery in the first degree and sentenced as a persistent violent felony offender to an indeterminate term of imprisonment of 25 years to life.

Among the many issues raised on appeal is the argument that the forcible stop of defendant at 6:00 A.M. and his subsequent warrantless arrest an hour later in his apartment were constitutionally impermissible and, therefore, mandated suppression of the unlawful fruits of that stop and arrest. Upon reviewing the applicable case law, I conclude that the police officers' pursuit and seizure of defendant outside 600 Baychester Avenue went beyond lawful bounds and that the People failed to meet their burden of proving that defendant had consented to the warrantless arrest in his home approximately an hour later.

When Officers Watson and O'Laughlin spotted defendant running past 600 Baychester Avenue at approximately 6:00 A.M., they were possessed of no information regarding this person which could amount to even a "founded suspicion that criminal activity [was] afoot" so as to permit them so much as the common-law right of inquiry. (People v De Bour, 40 NY2d 210, 223.) The police officers were at the location in response to a radio run of Hispanics stripping cars in the area. Defendant, a lone black man, was not the subject of this radio report. Of significance also is the fact that defendant did not begin to run as a reaction to seeing the officers, but was already running when the officers arrived at this location. This is in stark contrast to the facts of People v Howard (50 NY2d 583), which prompted that court to conclude that a limited right of inquiry was permissible. In Howard, the defendant had been observed by the police officers carrying a woman's vanity case in a high burglary area late at night. He was repeatedly glancing at the police, then changed his direction and quickened his pace, all before the police even attempted to question him (supra, at p 587). Here, all we have is a man running at 6:00 A.M. in the morning.

Neither did the officers have any right to pursue defendant and forcibly detain him when he failed to stop upon their

request and instead continued running. Controlling on this issue is *People v Howard (supra,* p 586), where the court stated: "An individual to whom a police officer addresses a question has a constitutional right not to respond. He may remain silent or walk or run away. His refusal to answer is not a crime. Though the police officer may endeavor to complete the interrogation, he may not pursue, absent probable cause to believe that the individual has committed, is committing, or is about to commit a crime, seize or search the individual or his possessions, even though he ran away."

Recognizing that a citizen's flight might, however, in certain circumstances be a factor in determining whether there was cause to pursue the citizen, the *Howard* court added *(supra,* p 592):* "Defendant's flight, had there also been indicia of criminal activity would have been an important factor in determining probable cause * * * but where, as here, there is nothing to establish that a crime has been, or is being committed, flight, like refusal to answer, is an insufficient basis for seizure or for the limited detention that is involved in pursuit".

These principles were recently reaffirmed by this court in *People v Torres* (115 AD2d 93). In *Torres,* the police had also been responding to a radio run of possible criminal activity which had no connection to the defendant. An officer spotted the defendant and attempted to elicit information from him about the radio run. Defendant refused to answer and walked away. Another officer watching the exchange then grabbed defendant and ordered that he answer the questions. Defendant ran away, pursued by three police officers who later recovered a gun defendant threw away in response to the unlawful police chase. Relying on *Howard (supra),* this court held (pp 97-99) that because there existed no objective evidence to suspect defendant of having committed any crime, defendant's refusal to answer and his flight from the police did not provide the probable cause necessary to pursue and forcibly detain him.

*People v Torres (supra)* and *People v Howard (supra)* are controlling here. Officers Watson and O'Laughlin had absolutely no basis upon which they could reasonably conclude that defendant had committed any crime. Running outdoors at 6:00 A.M. on a public street is not a crime. Neither is refusing to stop for the police. All that the officers could have done was to follow defendant "unobtrusively", if their suspicions had been aroused. *(People v Howard,* 50 NY2d, at p 592.) Instead, from the moment they first spotted him and yelled

"stop", the officers had been running after defendant causing him to continue running and discard the object he was holding.

Because this stop and seizure was unlawful, the fruits of that action, the ripped and stained skirt, about which prejudicial testimony was given at trial, and defendant's statements denying that he dropped the skirt and claiming that he was returning home from gambling, which were introduced at the trial to discredit him, should have been suppressed. *(Wong Sun v United States,* 371 US 471; *People v Rogers,* 52 NY2d 527, 532.)

Defendant is also correct in arguing that the People did not satisfy their heavy burden of establishing that he voluntarily consented to the police officers' entry into his apartment. A warrantless entry into a home to arrest someone is unconstitutional absent exigent circumstances or entry by consent. *(Payton v New York,* 445 US 573.) Whether in a given case consent has been freely given "or is only a yielding to overbearing official pressure must be determined from the circumstances" *(People v Gonzalez,* 39 NY2d 122, 128). The People bear a heavy burden of establishing that the consent was voluntarily and freely given. *(People v Dodt,* 61 NY2d 408, 417; *People v Whitehurst,* 25 NY2d 389, 391.)* Because consent rests on a waiver of constitutional rights, "courts indulge every reasonable presumption against the waiver of such rights" *(People v Rivera,* 90 AD2d 778, 779). The People's heavy burden has not been met here.

The only testimony concerning the officers' entry into defendant's apartment came from Officers Watson and O'Laughlin. Both agreed that it was Sergeant Hunt who knocked on the door and conversed with defendant. Yet, O'Laughlin admitted he was unable to hear the conversation. Watson, who stood to Hunt's right, remembered Hunt identifying himself and remembered that defendant somehow indicated that the five police officers could come in, but Watson could not "remember exactly how" defendant indicated this. The absence of Sergeant Hunt's testimony is very conspicuous. Without it, all that exists is the tremendously weak and ambiguous testimony of Officer Watson which hardly meets the People's heavy burden of establishing consent, especially when the People's position was flatly contradicted by defendant's testimony.

Defendant openly admitted to having opened the door to

Sergeant Hunt, who merely told defendant that a police officer was at the door. As defendant was turning on a light pursuant to Hunt's request, Hunt entered the room followed by Watson and O'Laughlin who informed defendant that he was under arrest. Defendant denied ever having given consent to the officers to enter his apartment. Viewing the circumstances in their totality, I am persuaded that consent was never given.

One significant factor determinative of whether or not defendant consented is the fact that just an hour earlier defendant had refused to cooperate with Officers Watson and O'Laughlin when they yelled for him to stop. It is unlikely that within one hour of having been unlawfully detained defendant would have had a sudden change of heart towards the police and allowed them into his apartment to arrest him without a warrant. Also, the fact that five uniformed officers were at his door undeniably created a tense and coercive environment unconducive to the giving of a voluntary consent, especially given the fact that defendant also had the presence of his children to worry about. That three of the officers at the door were the same ones who had earlier forcibly detained him, must also be viewed as a factor which would render defendant's consent improbable. These factors all support defendant's claim that he did not give the officers his consent to enter his home.

The blue jacket seized as evidence pursuant to defendant's arrest should, therefore, have been suppressed and should not have been introduced at trial. However, I do not agree with defendant's position that the lineup identification should have been suppressed. While the identification of defendant from the photo array can certainly be viewed as a result of the arrest since it took place that same day, the lineup identification did not take place until almost a month later. By that time, defendant was certainly in custody as a result of legal process and not merely as the result of the arrest. Also relevant is the hearing court's determination that the in-court identification had, in any case, an independent source. Under these circumstances, I conclude that the lineup identification was not tainted by the photo identification or the arrest.

Even assuming the lawfulness of the street stop which resulted in the seizure of the skirt, no testimony concerning the skirt should have been admitted at trial. That testimony was immensely prejudicial and denied defendant a fair trial, requiring a reversal of this conviction.

Over vigorous defense objections, Officers Watson and O'Laughlin were permitted to testify that when chased near the scene of the crime at 600 Baychester Avenue, defendant was holding a woman's skirt with two holes and a white stain, which he discarded as he was chased and which, after he was stopped, he falsely denied having discarded. It is uncontroverted that the skirt had absolutely no connection to the crime charged. Nevertheless, the testimony was admitted under the theory that it showed "consciousness of guilt".

Evidence of consciousness of guilt, although weak, is held to be admissible, but only when it is indicative of consciousness of guilt of the crime charged. (See, People v Moses, 63 NY2d 299, 308; People v Leyra, 1 NY2d 199, 209-210.) A different result is required, however, when the evidence only indicates consciousness of guilt of an uncharged crime. In People v Rivera (88 AD2d 892), the defendant, who was identified by the complainant as the person who had robbed him, threw a paper bag over a fence and into an alley when the police officers approached him. The bag contained a watch, but it was not the victim's watch. Testimony of the watch, though unconnected to the crime charged therein, was permitted at the trial, also under a consciousness of guilt theory. This court, which reversed the conviction solely on that issue, despite a positive identification by the victim, stated (p 893): "Since it was in no way connected to the robbery of Sumter, the evidence about the bag and its contents could only have the effect of leaving the jury with the impression that defendant had committed a similar but uncharged crime. Unless it constitutes evidence of a crime, one does not ordinarily disgorge himself of a watch upon a police command to stop. Evidence of an uncharged crime introduced solely to show that a defendant is of a criminal disposition and therefore likely to have committed the crime charged is inadmissible. (See, e.g., People v McKinney, 24 NY2d 180, 184; People v Schwartzman, 24 NY2d 241, remittitur amd 24 NY2d 914, cert den 396 US 846.) * * * We reject the argument that this evidence was admissible as reflecting a consciousness of guilt since the bag and its contents were not in any way connected to the Sumter robbery. Even if it were remotely relevant, such relevance was far outweighed by the prejudicial effect of the evidence. (See People v Davis, 43 NY2d 17, 27, cert den 435 US 998; People v Feldman, 296 NY 127, 137.) Evidence of consciousness of guilt has little probative value. (People v Leyra, 1 NY2d 199.)"

Likewise, here the prejudicial nature of the testimony concerning the skirt requires a reversal. The testimony, while irrelevant to the crime charged herein, must have certainly prompted the jurors to speculate concerning defendant's reasons for carrying such an item and then discarding it upon being chased by the police. Their speculations could hardly have led to any innocent interpretation, especially given the fact that Officer Watson had been permitted to testify that judging from the holes and the white stain, he initially suspected that defendant had raped someone. Rather than having had any probative value in proving the crime charged, the only real effect this evidence had was to suggest quite strongly that defendant had committed a very serious and violent crime, and as a result of that was more likely than not to have committed the instant crime. As in *People v Rivera (supra)*, the introduction of such testimony was prejudicial, requiring a reversal and a new trial.

Defendant was further deprived of his right to a fair trial by the trial court's refusal to charge on the weak probative value of consciousness of guilt evidence with reference to the testimony that defendant was observed running away from the scene of the crime, continued to run after being ordered to stop and discarded the stained skirt with two holes. The People concede that the better practice would have been to give the charge, but argue that the error was harmless. I cannot agree. A reasonable possibility does exist that this error, especially in conjunction with the erroneous admission of the testimony regarding the skirt as evidencing consciousness of guilt, did affect the jury's verdict.

As noted above, the testimony regarding the skirt was highly prejudicial, and there was a very real danger that the jury attached too much importance to it and the additional testimony of defendant's flight. One way to have prevented the jury from overemphasizing the significance of this ambiguous evidence would have been to closely instruct the jury concerning its inherent weakness. *(People v Yazum,* 13 NY2d 302, 304.)* The jury, however, did not have the benefit of such a charge, thereby permitting it to be unfairly swayed by this testimony and to resolve, in the People's favor, any doubts they may have had of defendant's guilt.

For all these reasons, I would reverse the conviction and order a new trial. I have reviewed the other points raised by defendant but find them to be without merit.

FEIN, J. (dissenting). I concur with Justice Carro that the conviction should be reversed and a new trial ordered. However, I disagree with his conclusion that the evidence was insufficient to establish that the entry of the police into defendant's apartment was with his consent. Accordingly, I disagree that the blue jacket seized as evidence at the time of defendant's arrest should have been suppressed.

However, the other errors described in Justice Carro's dissent were sufficiently prejudicial as to deny defendant a fair trial, thus warranting reversal. Particularly egregious was the admission of the testimony by the officers concerning their stop of defendant when they observed him running at 6:00 A.M. on the morning in question, and the reference to the woman's skirt which he was carrying and dropped before they apprehended him. None of that evidence had any possible bearing on the crime for which defendant was tried. It could only constitute prejudicial evidence of an uncharged and unproven crime.

KUPFERMAN, J. P., and ROSS, J., concur with SULLIVAN, J.; CARRO and FEIN, JJ., dissent, each in a separate opinion.

Judgment, Supreme Court, Bronx County, rendered on February 16, 1984, affirmed.