THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v EDDIE THOMPSON, Appellant.

First Department, February 15, 1990

APPEARANCES OF COUNSEL

*Diane Cummings Hand* of counsel *(Philip L. Weinstein,* attorney), for appellant.

*Patricia Curran* of counsel *(Patrick J. Hynes* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

SULLIVAN, J.

In this appeal from a conviction based on a guilty plea to sodomy and related crimes, the only issue is whether defendant unequivocally invoked his right to counsel, thereby vitiating his subsequent waiver of his *Miranda* rights, and rendering constitutionally infirm the inculpatory statement which followed.

At the suppression hearing, the People's proof showed that on the morning of February 26, 1987, defendant telephoned the 20th Precinct and spoke to the Manhattan Sex Crimes Unit's Detective McGowan, who had previously told defendant's family that she was looking for him with respect to a sexual assault which had occurred on February 17, 1987. During the conversation, McGowan asked defendant to come to her office, explaining that she needed to discuss "something" with him. Offering a variety of excuses, defendant indicated that he could not come. He stated that he had no money, and that he had been unable "to call [his] lawyer." Detective McGowan responded, "[I]f [the fact that he had not been able to call his lawyer] was the only reason why, that he could come to my office." Defendant then told McGowan that "he didn't know what time he could come in" and also that he wanted to wait until the next day. Detective McGowan, however, told defendant that she would not be working the following day.

After this conversation, Detective McGowan, accompanied by Detective Fleming, went to defendant's apartment, where she told defendant and his parents that she wanted him to go with her to discuss "something". Defendant agreed to go, and,

after dressing, left with the detectives. During the drive to the precinct, Detective McGowan asked defendant "who his lawyer was". Defendant replied that he did not have a lawyer. The detective then asked, "[w]hy did you tell me that that was one of the reasons why you couldn't come to my office?" In response, defendant said, "[w]ell I was going to call Jacoby and Meyers". Detective McGowan asked, "Are you serious?" Defendant said nothing in response. Detective McGowan then told defendant not to speak further about the case and that she would read him his *Miranda* warnings at the precinct. From that point on there was no further discussion with defendant about an attorney.

In an interview room at the precinct, Detective McGowan, after informing defendant that he was under arrest for a sexual assault and advising him to listen carefully, read him his *Miranda* warnings. After reading each warning, including that defendant had a right to have a lawyer present and that one would be provided for him without costs if he could not afford one, McGowan asked defendant whether he understood; each time defendant answered, "Yes."

After the *Miranda* warnings had been administered, defendant stated that he was willing to answer questions. When told that Barbara Snyder had made a complaint against him, defendant responded, "I didn't rape her, I just robbed her." According to defendant, the robbery had taken place at the victim's front door. When told that his fingerprints had been found in the bathroom, defendant admitted that he had attempted to sodomize Ms. Snyder.

Defendant, who testified at the hearing, knew that the police were looking for him. He telephoned the precinct and spoke to Detective McGowan because, "I wanted to tell her that I wanted to get a lawyer before I came down to see her." When defendant said that he "would like to get a lawyer," Detective McGowan responded that that "was not necessary, we just want to ask you a few questions." Defendant told the detective that he wanted to wait because his parents' Social Security checks were expected the following day and he wanted to use the money "to try to retain a lawyer." Their conversation ended when Detective McGowan advised him that she would not be working the following day. Shortly thereafter, Detectives McGowan and Fleming knocked at his apartment door and asked that he accompany them to the precinct. Defendant did not believe that he could refuse their request.

During the drive to the precinct, defendant told the detectives that he was "going to try to get a lawyer", who could "come down with me to the precinct". Detective McGowan told him that that would not be necessary since "all [she] want[ed] to do [was] ask me a few questions." Defendant also mentioned that he "was going to try to get" Jacoby and Meyers.

After their arrival at the precinct, and during an elevator ride to an upper floor, defendant again said that he "would like to get a lawyer". Detective McGowan reiterated that it was not necessary since she just wanted to ask him a few questions. When Detective McGowan asked for his lawyer's telephone number, defendant told her that he did not have a lawyer and "was going to get one the next day". The detective then read defendant his *Miranda* warnings. In response, defendant never said that he wanted an attorney.

The hearing court, crediting the testimony of the detectives, held that defendant had not invoked his right to counsel and denied the motion to suppress.[1] Finding that defendant had voluntarily waived his rights in response to the *Miranda* warnings, the court held that his prior statements about counsel were "clearly equivocal". Specifically, the court determined that defendant's statements that he was going to call Jacoby and Meyers the next day because he "might have some funds from his parents' Social Security to be able to retain counsel" was, if anything, a declaration of future intent. In addition, the court noted, defendant's testimony that "at all times he told the detectives that he would want to have an attorney" was belied by his own testimony that he understood the *Miranda* warnings, that he knew he had a right to his own attorney and that he nevertheless waived those rights and made a statement. The court further found that the detectives had not told defendant that he did not need an attorney or they were only going to ask him a few questions. Indeed, it found that there was no evidence of any "overbearing" or "coercive" conduct.

■ On appeal defendant argues that his statements to Detective McGowan constituted a request for a lawyer, and, thus, his incriminatory statement should have been sup-

---

1. Although the court stated that defendant was in custody and that his right to counsel "did attach", it is clear from the court's holding that it did not find that defendant had invoked his right to counsel so as to preclude a waiver of that right in response to the *Miranda* warnings.

pressed. Since defendant never stated that he had an attorney on the criminal matter on which he was to be questioned, or that he wished to have an attorney before being questioned, the court properly denied his motion to suppress.

At the outset, we note that although the court, for the most part, did not make specific findings about what was said or when particular statements were made, it obviously credited the detectives' testimony about what defendant had said on the telephone and in the car. Clearly, the court did not find defendant's testimony to be generally credible, and did not credit any of his testimony that he expressly requested a lawyer either in the car or in the precinct elevator. Defendant's suggestions to the contrary are not supported by the court's factual findings.

The law of this State protects the right to counsel of criminal suspects by providing that the invocation of the right to counsel precludes a later, uncounseled waiver. *(See, People v Cunningham,* 49 NY2d 203.) Such invocation, however, must be clear and unambiguous; a defendant must state unequivocally that he wants an attorney. *(People v Johnson,* 55 NY2d 931, *revg on dissent* 79 AD2d 201.) Here, it is clear that defendant did not unequivocally request an attorney before receiving the *Miranda* warnings and waiving his right to an attorney.

During his telephone conversation with Detective McGowan, defendant stated that he could not visit her office that day because he "could not get in touch with his lawyer" or had not "been able to call [his] lawyer". Whatever the exact words used, clearly such a statement was no more an unequivocal request for an attorney than was the telephone statement by the defendant in *People v Johnson (supra,* 79 AD2d, at 204) that she was "tired of [the police] bothering her" and "wanted to call a lawyer". Significantly, as in *Johnson,* defendant was not in custody at the time, but was completely free in his own home and without restraint to pursue whatever action he wanted.

Furthermore, when the detectives arrived at his apartment, defendant, who went unescorted to the rear of his apartment to dress, did not make any attempt to telephone a lawyer or request that his parents do so on his behalf. Nor did he, at that time, tell the detectives that he wanted to contact an attorney. Indeed, he made no reference at all to a lawyer. Defendant's failure to do so confirms that his prior telephone

reference to a lawyer, just one-half hour before, was not intended as an unequivocal request for counsel.

Significantly, before they ever questioned defendant, the detectives sought to determine if, as he had intimated over the telephone, he was indeed represented by counsel. In response to Detective McGowan's request in the car that he identify his lawyer, defendant admitted that he did not have one. This inquiry resolved any ambiguity in defendant's earlier telephone statement and showed that, in fact, he had not retained a lawyer to represent him. *(See, People v Roe,* 73 NY2d 1004 [no bar existed to questioning where the defendant admitted that an earlier statement that he had a lawyer was false].)

Even more equivocal than his telephone references to a lawyer were defendant's remarks about Jacoby and Meyers. When, after learning during the trip to the precinct that defendant did not have a lawyer, Detective McGowan asked him why he had proffered that excuse, defendant responded, "[W]ell I was going to call Jacoby and Meyers". Statements such as this have repeatedly been held not to constitute an unequivocal request for counsel. *(See, e.g., People v Hartley,* 65 NY2d 703, 705 [defendant appearing voluntarily for questioning claimed that he had informed the police that he had arranged for an appointment with an attorney]; *People v Rowell,* 59 NY2d 727, 730 [defendant suggested to the police that he might consult a lawyer]; *People v Hicks,* 69 NY2d 969, 970 [defendant asked police "should I speak to a lawyer"]; *see also, People v Ward,* 134 AD2d 544; *People v Santiago,* 133 AD2d 429, *affd* 72 NY2d 836.)

Here, defendant's remark that he was going to call Jacoby and Meyers was, at best, a declaration of his past or future intentions. That the comment was not an unequivocal request for counsel is also confirmed by the fact that when McGowan sought clarification of the remark by asking defendant whether he was "serious", defendant failed to respond or give any indication that he wanted a lawyer from Jacoby and Meyers, or, for that matter, any attorney.

Furthermore, if defendant had meant to ask for a lawyer on the telephone or in the car, he would have made that known in response to the *Miranda* warnings. That he gave no such explanation, but merely acknowledged that he understood each right, which obviously included the right to have a court-appointed lawyer present during questioning, and then agreed to speak to the detective without an attorney present, clearly

demonstrates that none of defendant's prior comments about a lawyer were unequivocal requests for counsel.[2]

The hearing court, without indicating at what stage of the process the statement was made, apparently credited defendant's testimony that he made one other relevant statement, namely, that "he was going to call Jacoby and Meyers as an attorney the next day because he might have some funds from his parents' Social Security to retain counsel." Whether made on the telephone or in the car, this statement, however, was still no more than a statement of future intention and did nothing to make defendant's mention of a lawyer less equivocal. Indeed, the additional contingencies, if anything, render it even more remote and uncertain. It should be noted that by crediting this statement, the hearing court in no way implied that it was crediting all of defendant's testimony. It did not, as defendant argues, accept his self-serving testimony that he had, both in the car and in the precinct elevator, expressly invoked his right to counsel, and we see no reason to disturb that credibility finding.

Defendant argues that because he was in custody his statements are somehow less ambiguous. Defendant's statements would, of course, be no less equivocal had he been in custody. In point of fact, however, all of the statements actually credited by the court were made at a time when defendant was not in custody. The courts have yet to devise a "fixed list of factors" that would facilitate a mechanical determination of when a given set of circumstances amounts to an arrest. *(People v Hicks,* 68 NY2d 234, 239.) The Court of Appeals has, however, rejected the subjective belief of either the officer or the citizen as a standard for determining when a de facto arrest has taken place. *(Supra,* at 240.) Instead, the applicable standard is " 'what a reasonable man, innocent of any crime, would have thought had he been in the defendant's position' " *(supra,* at 240, quoting *People v Yukl,* 25 NY2d 585, 589, *cert denied* 400 US 851).

■ That defendant was not in custody until after he had made his statements about Jacoby and Meyers is demon-

---

2. There is no reason to believe that defendant, who was 32 years old at the time and had attended school to the middle of the twelfth grade, was not fully aware that he could have had a lawyer, if he wanted one, and that he did not need money in order to secure a lawyer's services. He had several earlier experiences with the criminal justice system, having been arrested at least four times, had received the *Miranda* warnings on at least one prior occasion, and had been twice represented by a court-appointed lawyer.

strated by the circumstances surrounding both the detectives' visit to the apartment and the ride to the precinct. It was defendant himself, presumably on information from his parents, who initiated the encounter with the police by telephoning Detective McGowan on the morning of February 26, 1987. When the detectives arrived at his apartment shortly thereafter, their plain-clothes attire, unmarked car, and appearance at the apartment door, asking defendant's father to see defendant, all were hardly indicative of a forcible arrest.

When defendant appeared, McGowan told him only that she wanted him to come with her to discuss "something". At no time did she advise defendant that he was under arrest. That defendant was not in custody at that point is further shown by his going unescorted to the rear of the apartment to dress. In addition, the invitation by defendant's father to both detectives to wait inside the apartment demonstrated that the encounter was free of tension. Defendant did not ask for any further explanation from the detectives. Nor is there any evidence that he resisted accompanying them in any way. Defendant was never handcuffed. Rather than ride in the front of the car with her partner, Detective McGowan sat in the back seat with defendant, which was far more indicative of a friendly discussion than a forceful detention. Indeed, it was only when Detective McGowan stated, after defendant's remark about Jacoby and Meyers, that he should remain silent until she had read him his rights at the precinct, that an innocent man in defendant's position would have questioned whether he was free to leave.

Although, as already noted, one who was guilty of the crime under investigation might automatically have assumed that he was under arrest, that is not the test for custody. Despite Detective McGowan's and defendant's subjective opinions that defendant was not free to leave, the circumstances surrounding the meeting at defendant's apartment and the drive to the precinct are totally consistent with what a reasonable, innocent man would have perceived as a request by the police that he voluntarily accompany them to discuss what, if anything, he knew about a recent sexual assault. *(See, People v Hicks,* 68 NY2d 234, *supra.)*

Defendant also suggests that he might have unequivocally invoked his right to counsel on the way to the precinct if he had not been "cut off" when Detective McGowan asked whether he was "serious" about retaining Jacoby and Meyers. This claim, however, is belied by a reading of the entire

conversation, which was obviously aimed at determining whether defendant had a lawyer, and not at aborting any discussion of the subject. It was, after all, Detective McGowan who broached the subject of a lawyer as soon as she and defendant were in the car. Even when defendant stated that he did not have a lawyer, McGowan tried to clarify defendant's earlier telephone remark. When defendant then mentioned Jacoby and Meyers, it was clear from the detective's question that she had a doubt as to his intentions. When defendant failed to respond, McGowan advised him to say nothing until she read him his *Miranda* warnings at the precinct. Thus, the detective, in an excess of caution, chose not to speak further about the case until she had read him his *Miranda* warnings. Such conduct was hardly overbearing or coercive.

Finally, defendant's reliance on *People v Esposito* (68 NY2d 961) is misplaced. There, the Court of Appeals did not engage in any analysis of whether the defendant had invoked his right to counsel, but, instead, specifically relied upon the Appellate Division's finding that the defendant's postarrest statement, "I might need a lawyer," followed by the police officer's referring him to a local telephone directory, constituted a request for counsel. Based solely upon that factual determination, the court held that once a defendant had invoked his right to counsel, he could not make an uncounseled waiver of that right. Thus, *Esposito* sheds no light on the question of whether defendant invoked his right to counsel here.

Since defendant's comments that he had not called his lawyer, that he "was going" to call Jacoby and Meyers, or at least that he might do so if his parents received Social Security checks the following day and furnished him with the necessary funds were, at best, statements of past or future intent, they plainly do not constitute an unequivocal request for counsel.

Accordingly, the judgment of the Supreme Court, New York County (Robert Haft, J.), rendered September 15, 1987, convicting defendant of two counts of sodomy in the first degree, attempted rape in the first degree, three counts of sexual abuse in the first degree and robbery in the first degree and sentencing him to concurrent indeterminate terms of imprisonment of from 4 to 12 years on each conviction, should be affirmed.

MURPHY, P. J., KASSAL, WALLACH and SMITH, JJ., concur.

Judgment, Supreme Court, New York County, rendered on September 15, 1987, unanimously affirmed.