OPINION OF THE COURT
Burton B. Roberts, J.
The defendant was indicted and is charged with 174 counts of murder in the second degree, as well as arson in the first degree, arson in the second degree, attempted murder in the second degree, and assault in the first degree, totaling 178 counts. These charges arise from a fire which took 87 lives at the Happy Land Social Club, located at 1959 Southern Boulevard, in the Bronx, at about 3:40 a.m. on March 25, 1990. He now moves to suppress physical evidence[1] seized by the police and the statements made to them, and an Assistant District Attorney, on the grounds that they were unlawfully obtained. A combined Mapp/Huntley hearing was held and the following evidence was adduced.
*189 On March 25, 1990, at 5:00 a.m., Lieutenant James Malvey, commanding officer of the 48th Precinct Detective Squad, was informed by a police dispatcher that more than 70 people had died in a "suspicious” fire at the Happy Land Social Club on Southern Boulevard. Upon receiving this information, Lieutenant Malvey, a police officer with some 26 years of service went to the precinct and assigned Detective Kevin Moroney, who had been with the New York City Police Department for 23 years, to the case. The lieutenant then traveled to the crime scene where he learned that an accelerant had been used to start the fire in the south entrance of the club and that the Fire Marshal had declared the conflagration to be an arson. Additionally, Lieutenant Malvey also discovered that a white receptacle which contained an accelerant, believed to be gasoline, had been found.
Meanwhile, Detective Andrew Lugo, a 26-year veteran of the police force, heard over the radio that 87 people had lost their lives in a Bronx social club fire. Although the detective was off duty that day, he nonetheless called his office to ascertain whether any assistance was needed, and then arrived at the precinct at approximately 9:00 a.m. He interviewed several people there, including Lydia Feliciano. Ms. Feliciano had been a ticket-seller at Happy Land and she told Detective Lugo that the defendant, her ex-boyfriend, had arrived at the club around 3:00 a.m. that day. The former lovers had quarreled and defendant angrily told Lydia— "You’ll see. Tomorrow you’re not going to be working here,” and he also declared that the club was not going to be there anymore. Then he was removed by a bouncer. Additionally, Ms. Feliciano informed the police that the defendant had been seen outside the club at approximately 3:30 a.m. shortly before the fire began by her niece, who became one of the victims.
Detective Moroney interviewed Kenneth Prince, who mentioned to the officer that he had filled a container with gasoline for a male hispanic who wore a carry bag with a cassette player. Mr. Prince did not provide the detective with an exact description of the man.
After preliminary investigations were conducted, Lieutenant Malvey decided that an attempt to interview the defendant should be made. The lieutenant, however, made clear to police personnel, including Detectives Lugo and Moroney, that this was not going to be an "apprehension situation” since he correctly believed there was no probable cause to arrest *190 defendant under the circumstances and facts then known to law enforcement officials. At that time, the police were unaware of defendant’s admissions to his friends Arturo Martinez, Pedro Rivera and Mr. Rivera’s wife. Thus, the lieutenant emphasized that defendant was to be questioned only if the suspect consented to be interviewed. The lieutenant stressed that under no circumstances was defendant to be arrested or placed into custody. Accordingly, Detective Lugo, Lieutenant Malvey, Detective Moroney, Fire Marshal Catell and Arturo Martinez proceeded in an unmarked police vehicle to 31 Buchanan Place in the Bronx. Mr. Martinez had been recruited to show the officers where defendant lived.
The police team consisting of a car driven by Detective Lugo, and three other unmarked police vehicles, including an observation van, proceeded to the vicinity of 31 Buchanan Place. The van was being utilized in the event it became necessary to place defendant under surveillance in the event he refused to be interviewed or was not then at the location. Inside the van was Norberto Torres, Lydia Feliciano’s son. In order to ascertain whether defendant was home, Mr. Torres, when he arrived at the designated location, attempted to telephone defendant from the van by dialing a number he had previously used to reach defendant. Mr. Torres was unsuccessful in his efforts to contact defendant. The telephone number which was dialed was not located in defendant’s own room. Detective Lugo and his companions thereupon decided to enter the building in which defendant resided.
At approximately 2:00 p.m., Detective Lugo and the other officers, none of whom were wearing bullet proof vests, went inside 31 Buchanan Place and went up one flight of stairs. There, through an open apartment door, they encountered a man and a woman, later known to be Pedro Rivera and Carmen Melendez, who informed the officers that the defendant was upstairs sleeping. At Detective Lugo’s request, Mr. Rivera accompanied the officers upstairs, knocked on defendant’s door, yelled "Julio”, and stepped back. When defendant opened the door, he was clad in pants and a shirt, but was not wearing shoes. Detective Lugo identified himself as a police officer and displayed his badge and identification card to the defendant, whereupon defendant, without being asked, invited them in saying "Yes, come in” and gestured with his right hand and arm in a manner emphasizing his oral invitation. Detective Lugo, who is fluent in Spanish, spoke with the defendant in that language at all times. All three officers *191 entered the 8 foot by 10 foot room but only Detective Lugo walked up to defendant and was the only one who spoke to him. Lieutenant Malvey remained by the doorsill and Detective Moroney just took a few steps into defendant’s room. Once inside the room, the officers noticed a "strong” smell of gasoline and Detective Moroney observed a carry bag in open view on some furniture.
All three officers testified that defendant was not in custody in the room, nor was he searched, questioned, handcuffed or restrained in any fashion. Furthermore, none of the officers drew or showed their weapons, raised their voices or gave any orders to the defendant. Rather, Detective Lugo asked defendant in a conversational tone if he would accompany them to the station house to discuss an investigation, the nature of which was not revealed. The defendant immediately replied "yes, let’s go,” but Detective Lugo, conscious of the gasoline fumes, asked defendant what shoes he planned to wear. When defendant gestured toward a pair of black shoes which reeked of gasoline, Detective Lugo asked defendant if he had another pair. At this point, the other officers told Detective Lugo that defendant could wear whatever shoes he wished. The defendant then proceeded to don the black shoes and put on a maroon jacket. After he splashed water on his face and fixed his hair, defendant walked out of the room and locked the door behind him.
No one touched the defendant as he walked unrestrained down the stairs. Detective Lugo and Lieutenant Malvey followed defendant. The only conversation that ensued as they approached the unmarked police vehicle was when the defendant informed Detective Lugo that a group of men across the street were drug dealers. Before defendant entered the car, Detective Lugo briefly patted him in the waist and pocket area. This superficial frisk was conducted pursuant to established police procedure to ensure the safety of the occupants of the vehicle, since it is customary to pat down a civilian suspect, witness, or even a complainant who enters a police vehicle.
No questions were asked of the defendant during the 10-minute ride to the precinct. Defendant was not handcuffed and he sat unrestrained in the rear of the car next to the passenger door which had not been locked by any officer. The only conversation was a denial by Detective Lugo of a request by the defendant to smoke a cigarette because of the gasoline fumes emanating from his shoes.
*192 When the group arrived at the station house, at approximately 2:15 p.m., defendant followed the police officers to an interview room, which was also referred to as the lieutenant’s locker room. There, he was offered coffee, which he accepted, and food, which he declined. Detective Moroney went to get the requested coffee, leaving Detective Lugo inside the interview room alone with the unrestrained defendant. The room’s closed door could be opened from the inside, but was locked from the outside.
Before asking any questions, Detective Lugo preliminarily remarked to the defendant that the investigation involved a fire at the Happy Land Social Club and it was the detective’s understanding that defendant had been there the prior night. Before anything further was said, and not in response to any question, the defendant began crying and exclaimed, "It was me. I did it. It was me. I set the fire to the club.”
As defendant sobbed, Detective Lugo briefly left the room to inform Lieutenant Malvey that defendant was "giving it up.” The detective promptly returned to the room, waited for defendant to compose himself, and then informed the defendant that he was under arrest. Reading from a card issued by the police department which had the Miranda rights in both English and Spanish and which was introduced into evidence as People’s exhibit No. 1, Detective Lugo advised defendant in Spanish of his constitutional rights. Specifically, the following colloquy ensued: "You have the right to maintain silence and not to answer any questions. Do you understand?” to which defendant said "Yes”; "Anything you say may be used against you in a court of law. Do you understand?” Again, defendant responded "Yes”; "You have the right to consult with a lawyer before speaking with the police and to have a lawyer present during any questioning now or in the future. Do you understand?” Defendant replied "Yes”; "If you don’t have the money to pay a lawyer, one will be facilitated [sic] for you without cost to you. Do you understand?” Again, defendant answered "Yes”; "If you don’t have a lawyer at this disposition [sic] you have the right — You have the right to remain silent until you have the opportunity to consult with a lawyer. Do you understand?” Defendant said "Yes”. Finally defendant was asked, "Now that I have explained these rights to you, do you want to answer any questions?” Defendant answered "Yes” and began to make an oral statement in which he recounted the events of March 25, 1990.
Specifically, defendant admitted that he had an argument at *193 the club with Lydia Feliciano, and had been ejected by two bouncers at his ex-girlfriend’s request. After his expulsion, defendant decided to set fire to the club. While walking in the nearby street, defendant found an empty antifreeze container. He then paid $1 to have it filled with gasoline at a nearby AMOCO gas station. Defendant then walked back to the club, waited until he would not be seen, entered the open south entrance door, poured the gasoline on the floor, simultaneously lit two matches and threw them into the pool of gasoline, which is an accelerant. After walking away from the club toward a bus stop, he saw fire engines and ambulances respond to the scene. Defendant returned briefly to watch the conflagration, and then boarded a bus, put on his radio headset cassette player and dark glasses and cried. Upon arriving home, defendant knocked on the door of his friends Pedro Rivera and Carmen Melendez, and told them that he had killed Lydia Feliciano by setting fire to the club where she worked. Defendant then went to bed. At about 9:30 the same morning Mr. Rivera knocked on defendant’s door and told him that Arturo Martinez had called. Defendant then went to the room of another friend, Juan Madrigal, and telephoned Mr. Martinez. In response to Arturo’s inquiry, defendant denied setting the fire and later explained to Detective Lugo that he had not wanted to speak about the fire with Mr. Martinez on the telephone. At about 11:00 a.m. that day, Mr. Martinez visited the defendant and the two men spoke in Arturo’s car, where defendant admitted setting fire to the club. Mr. Martinez told the defendant that the police were going to accuse defendant of starting the fire because Ms. Feliciano had survived. Defendant told his friend that if the police came around asking questions, Arturo should “tell the truth” and give them defendant’s address since he was going to surrender.
After defendant completed his oral statement, Detective Lugo asked his permission to take the black shoes he was then wearing. Defendant agreed to do so and handed his shoes over to the officer, who in turn gave them to Detective Moroney. Detective Moroney then vouchered the items and provided defendant with a pair of slippers.
The oral statement was then repeated, enlarged upon by the defendant and reduced to writing. Defendant reiterated the account in Spanish and Detective Lugo contemporaneously transcribed the information into English in his notebook. *194 Detective Moroney was present and listened to Detective Lugo’s translation of the statement.
In this statement, defendant admitted that he had gone to the social club where he greeted Lydia Feliciano, who was selling entrance tickets, paid her a $5 admission charge, went inside and had some beer. He returned to Lydia and told her that he loved her and would always love her. But when Lydia told him, in response to defendant’s question, that she had many prospective boyfriends, defendant became infuriated and told Lydia that she would not work at the club anymore. At this point, Lydia asked the bouncers to remove defendant from the club. As defendant was pushed outside, he said "okay, I’m going to close this place.” As defendant walked to the bus stop, he decided to set fire to the club. Defendant turned into a nearby bus depot and found an empty white antifreeze container in a dumpster. Defendant then took the container to an AMOCO gasoline station where he paid $1 to have it filled with gasoline upon the pretext that his car had run out of gas. Defendant returned to the club, but seeing people in front of Happy Land, he waited on the steps of La Montana Moving Company until the people gathered outside left. Defendant once again approached the club but feigned making a telephone call when he observed a woman walk out of the club. Only after this woman went back inside the club did defendant go to the open door and pour gasoline between the inner and outer entrance doors. Then, defendant threw two lit matches on the puddle of gas and watched the fire run from the front to the rear on the floor.
Defendant walked away from the scene, but then turned to watch the fire and to observe a woman being administered oxygen. Then, defendant took the bus home and began to cry when he realized what he had done. When he returned home, defendant eventually told his friends what he had done and defendant instructed Arturo Martinez to tell the police the truth if they came around and to give them his (defendant’s) address.
Upon completion, the 19-page written statement was read back to defendant in Spanish and signed by both defendant and Detective Lugo and was received in evidence as People’s exhibit No. 2. Despite the fact that he did not understand Spanish, Detective Moroney observed the defendant affirmatively nod his head several times as Detective Lugo read the written statement out loud in Spanish. The defendant also signed a duplicative English and Spanish consent form which *195 was received in evidence as People’s exhibits 2B and 2C which authorized the police to take his black shoes, and his radio cassette.
Defendant then informed Detective Lugo that he would be willing to speak with someone from the District Attorney’s office. Assistant District Attorney Cindy Zamzok arrived at the precinct, was briefed, and at 6:17 p.m. began taking a videotaped statement from defendant. Although he was previously advised of his constitutional rights, Assistant District Attorney Zamzok nonetheless readvised defendant of his Miranda rights through Spanish interpreter George Santiago.
Specifically, the following conversation ensued: "You have the right to remain silent, you understand?” to which defendant affirmatively nodded his head; "Anything you say can be used against you in a court of law. Do you understand?” and again defendant nodded affirmatively; "You have the right to consult with an attorney and to have the attorney present with you now during this interview. Do you understand?” Defendant affirmatively nodded his head. Then, directing defendant to answer verbally, Assistant District Attorney Zamzok again stated "You have the right to remain silent. Do you understand, yes or no?” to which defendant answered "Yes”; "Anything you say can be used against you in a court of law. Do you understand?” Again, defendant said "Yes”; "You have the right to consult with an attorney and to have the attorney present with you now during this interview. Do you understand?” and defendant remarked "I have no attorney”; "You have the right to an attorney. If you cannot afford an attorney, one will be appointed to represent you free of charge, prior to any questioning. Do you understand?” Defendant said "Yes”; "So once again you have the right to consult with an attorney, and to have that attorney present with you now, during this interview. Do you understand that?” Defendant replied "Yes”; "If you cannot afford an attorney, one will be appointed to represent you free of charge prior to any questioning. Do you understand?” Defendant said "Yes”; "Now that I have advised you of your rights, do you want to give me some information about your background and your version of the facts?” To which defendant stated "Yes”, and proceeded to again confess in detail to having set the fire. The transcript of the confession was settled and stipulated to by both attorneys and was received in evidence as court’s exhibit No. 2.
The videotaped statement was introduced into evidence as People’s exhibit No. 9 and was played during the hearing. It *196 conformed to the defendant’s statement which had been reduced to writing by Detective Lugo. On the video, defendant appeared calm and cooperative, and answered the questions in a responsive manner. Defendant acknowledged on the tape that he had been treated fairly by the police.
Although defendant had consented to permit the police to enter his room and obtain designated items, Detective Moroney nonetheless exercised caution and obtained a search warrant for the premises. The detective’s affidavit was based on his knowledge of defendant’s confession as related by Detective Lugo, and his interview with Kenneth Prince.
Judge Hunter signed the search warrant, which authorized the seizure of a red carry bag and its contents.
At about 8:50 p.m. Detective Moroney executed the warrant, seizing the red bag and headphones from defendant’s room at 31 Buchanan Place. The property seized pursuant to the search warrant was vouchered and a return was made two days later before a Bronx County Supreme Court Justice. Detective Roussine of the Crime Scene Unit seized the clothing defendant had been wearing at the precinct and defendant was given clothing recovered from his apartment to wear.
The court finds Detective Lugo, Lieutenant Malvey, and Detective Moroney to be most believable and gives credence to the entire testimony of all three police officers. Faced with an overwhelming tragedy and a crime of monumental proportions, they exhibited commendable caution in order to preserve the constitutional rights of the defendant and in so doing insured the legality of the evidence which they subsequently obtained. Their police work is a textbook example of industry, ingenuity, and the manner in which the constitutional rights of a defendant could and should be protected.[2]
CONCLUSIONS OF LAW

Defendant’s Initial Inculpatory Statement Made in the Police Precinct Was Not the Product of Custodial Interrogation

Whenever a defendant is subjected to custodial interroga *197 tian by the police without first being informed of his right against self-incrimination, any statement made in response to the questioning is inadmissible at trial as part of the People’s case-in-chief. (See, People v Bethea, 67 NY2d 364, 366-367 [1986]; People v Rivera, 57 NY2d 453, 454 [1982].) Here, it is undisputed that defendant was not apprised of his constitutional rights prior to his declaring to Detective Lugo "It was me. I did it. It was me. I set the fire to the club”. Thus, a pertinent inquiry is whether defendant was in custody at the time he made this admission.
Defense counsel alternatively argues that: (1) defendant was unlawfully arrested in his apartment and, consequently, subsequent statements made by him must be suppressed as fruits of the improper conduct; and (2) even if an arrest did not occur inside 31 Buchanan Place, defendant was under arrest, or at the very least placed in custody, when he entered the lieutenant’s room and therefore, his admission must be suppressed as a pre-Miranda product of a custodial interrogation. (See, Dunaway v New York, 442 US 200 [1979]; United States v Bayer, 331 US 532, 540 [1947]; People v Byrne, 47 NY2d 117, 122 [1979].) In response, the People maintain that there was a freely given consensual entry into defendant’s room, and that defendant also voluntarily consented to accompany the police officers to the precinct. The People further contend that defendant was not in custody or under arrest at any time prior to his making the initial inculpatory statement and thus Miranda rights were not required to be given when Detective Lugo first spoke with defendant in the lieutenant’s room.
Unquestionably, the burden of demonstrating the voluntariness of consent is a heavy one and the totality of the circumstances must be examined to determine whether consent has been established. (See, People v Gonzalez, 39 NY2d 122, 128 [1976]; People v Kuhn, 33 NY2d 203, 208 [1973]; People v Entzminger, 163 AD2d 138, 141 [1st Dept 1990]; People v Gonzalez, 115 AD2d 73, 79 [1st Dept], affd 68 NY2d 950 [1986]; People v Saglimbeni, 95 AD2d 141, 145 [1st Dept 1983].) Here, the People have met their burden. This court has already indicated that it credits in its entirety the testimony of the People’s witnesses and concludes that the police entry into defendant’s apartment was clearly consensual.
When defendant opened his apartment door, Detective Lugo merely displayed his shield and identified himself. There was no display of force or coercion by the officers, no guns were *198 drawn or shown and no orders were given to the defendant. In fact, Detective Lugo had not even asked defendant if he could enter the apartment when the defendant gestured and invited the officers to "come in.” Clearly, the facts unequivocably demonstrate that the defendant’s consent to the entry was given voluntarily and was not merely a submission to authority. (See, e.g., People v Jones, 118 AD2d 86 [1st Dept 1986], affd 69 NY2d 853 [1987]; People v Murphy, 55 NY2d 819 [1981]; People v Phiefer, 43 NY2d 719 [1977]; compare, People v Harris, 72 NY2d 614, 616 [1988], revd 495 US 14, [1990], on remand 77 NY2d 434, 436, n 1 [1991] [no consensual entry where three police officers with drawn guns blocked apartment exits and knocked on defendant’s door].)
This court also finds that the defendant voluntarily consented to accompany the officers to the precinct. Once inside the apartment, Detective Lugo informed defendant that they would like to speak with him about an investigation and defendant was asked whether he would like to go to the precinct with them. Defendant’s response of "Yes. Let’s go” was freely given. The police never threatened defendant nor displayed physical force, and did not handcuff or otherwise restrain him. Defendant was not directed to follow the officers and was not touched in any manner. At all times defendant was cooperative with and responsive to the police, and once the decision to go to the station house was made, defendant was not rushed out of the room, as evinced by that fact that he was permitted to dress as he wished, to fix his hair, lock his door and lead Detective Lugo and Lieutenant Malvey down the stairs. Defendant’s interaction with the police inside the apartment was free of tension, and his consent was the result of a knowing and intelligent decision, and not the product of overbearing police conduct. (See, e.g., People v Jones, 118 AD2d, supra, at 95.)
The fact that the defendant consented to the police entry and went to the precinct voluntarily is supported by his subsequent statements which reveal his state of mind at the time the police arrived at his door. Specifically, defendant’s remarks to Detective Lugo that he had previously admitted to Pedro Rivera, Carmen Melendez and Arturo Martinez what he had done, that he had been planning to turn himself in, and that Arturo Martinez had been instructed by him to cooperate with the police and to divulge defendant’s address if asked shows defendant’s contriteness and desire to cooperate with law enforcement authorities. Thus, defendant’s ready willing *199 ness to consent is consistent with his obvious desire to relieve his overburdened guilty conscience.
Defendant’s arguments that he was in custody or under arrest when he gave the initial incriminating statement must also be rejected. That fact that one is in a police station is not necessarily indicative of whether one is in custody. (See, People v Davis, 161 AD2d 395, 396 [1st Dept 1990]; People v Steadman, 157 AD2d 756 [2d Dept 1990].) In deciding whether a defendant was in custody, the subjective belief of the defendant is not a determinative factor. Rather, the inquiry to be made is whether a reasonable person, innocent of any crime, would have believed he or she were in custody had he or she been in the defendant’s position. (See, People v Centano, 76 NY2d 837, 838 [1990]; People v Yukl, 25 NY2d 585, 589 [1969], cert denied 400 US 851 [1970]; People v White, 164 AD2d 413, 417 [1st Dept 1991].) Based on its findings of fact, with regard to the testimony of the three police officers, this court concludes that defendant was not in custody or under arrest at any time prior to his making the initial inculpatory statements.
To elaborate, prior to arriving at 31 Buchanan Place, the police were aware that: (1) defendant had been at the Happy Land Social Club between 3:00-3:30 a.m. and had threatened Lydia Feliciano by telling her "You’ll see. Tomorrow you’re not going to be working here”, and that the club was not going to be there anymore; (2) an accelerant had been used to start the fire; (3) a hispanic male had brought gasoline, an accelerant, near the club; and (4) defendant was seen outside the club just prior to the fire. Although defendant was certainly a suspect in the case, the police did not believe they had, and indeed did not have, probable cause to arrest him. Thus, in an attempt to acquire information and not to make an arrest, the officers went to defendant’s dwelling.
There is no evidence that defendant was taken into custody or placed under arrest inside his room. As previously discussed, defendant voluntarily invited the police into his residence. Defendant was not handcuffed or restrained in his home and the police did not use force, threats, promises or intimidation to induce defendant to accompany them to the station house.
Notably, defendant walked unhindered toward the police vehicle. No one physically forced or ordered defendant to approach or enter the car. The fact that defendant was *200 superficially frisked before he entered the vehicle does not establish that defendant was in custody or raise the level of the encounter to that of an arrest. (See, People v Morales, 65 NY2d 997, 998 [1985].)
The perfunctory frisk was conducted pursuant to established police procedure and was limited to a patting of defendant’s waist and pocket area. Detective Lugo did not put his hands inside defendant’s pockets and defendant was not placed against the car. A police officer is not required to take unjustified risks. This was a case where a person was suspected of causing the deaths of 87 people. Thus, the limited pat down represented the exercise of an appropriate safety measure and was not reflective of a custodial situation.
The noncustodial nature of defendant’s interaction with police continued to the moment he made his first inculpatory statement. Defendant traveled unhandcuffed and unrestrained to the precinct in an unlocked car and was not questioned on the way there. Only one officer was seated in the back with defendant, a situation which is more indicative of an informal encounter than a forceful detention. (See, e.g., People v Thompson, 153 AD2d 456, 463 [1st Dept 1990].)
At the precinct, defendant went into a room from which he had egress, and was offered coffee, which he accepted, and food, which he declined. Defendant was present in the lieutenant’s room for only a few minutes when he suddenly confessed to the arson and started crying. At no time was defendant handcuffed. Certainly, the testimony reveals that under the circumstances then present, a reasonable person, innocent of any crime, would not have thought he or she was in custody. Thus, these facts demonstrate that defendant’s initial statement was not the product of custodial interrogation. (See, e.g., People v Bryant, 71 AD2d 564, 565 [1st Dept 1979], affd 50 NY2d 949, cert denied 449 US 958 [1980]; see also, People v Spellman, 168 AD2d 318 [1st Dept 1990]; People v Davis, 161 AD2d 395, 396 [1st Dept 1990].) Therefore, that branch of defendant’s motion to suppress the initial inculpatory statement is denied.[3]
*201 Even assuming, arguendo, that the defendant was in custody at the moment he was in the lieutenant’s room, the suppression decision would remain unaffected. Detective Lu-go’s remarks to defendant that "the investigation involve[s] a fire at the Happy Land Social Club on Southern Boulevard and I understand that [you] had been there the night before” was a simple statement of fact, not designated to evoke an incriminating response from defendant. (See, Rhode Is. v Innis, 446 US 291 [1980]; People v Howard, 60 NY2d 999, 1001 [1983]; People v Rivers, 56 NY2d 476, 478-479 [1982]; People v Lynes, 49 NY2d 286, 295 [1980].) Thus, defendant’s utterance, wherein he blurted out "It was me. I did it. It was me. I set the fire to the club” and started sobbing is admissible as a spontaneous declaration, since it was not made as a result of inducement, provocation, encouragement or acquiescence. (See, People v Gonzales, 75 NY2d 938, 939, cert denied — US —, 111 S Ct 99 [1990]; People v Maerling, 46 NY2d 289, 302-303 [1978].)

Defendant’s Subsequent Statements Were Made Voluntarily

Probable cause most assuredly existed for defendant’s arrest after he confessed to having committed the arson. (See, People v Hicks, 68 NY2d 234, 238 [1986]; People v Bigelow, 66 NY2d 417, 423 [1985]; People v Bryant, 71 AD2d, supra, at 565; CPL 140.10 [1] [b].) Therefore, defendant’s arrest at that point was lawful, and, contrary to defendant’s assertions, statements he subsequently made are not suppressible as fruits of an improper arrest. (Compare, Wong Sun v United States, 371 US 471, 484-487 [1963] [statements made by defendant after improper arrest were fruits of an unlawful action and must be excluded from evidence]; see also, Dunaway v New York, 442 *202 US 200, 219 [1979] [same]; People v Harris, 77 NY2d, supra, at 440-441 [same].)
Defendant further contends that his oral, written, and videotaped confessions must be suppressed since he did not knowingly and voluntarily waive his Miranda rights. In particular, defendant claims that a faulty translation rendered the videotaped warnings inadequate.[4]
Since this court finds that the People have proven beyond a reasonable doubt that the statements were made voluntarily and defendant was adequately apprised of his rights, both by Detective Lugo and then by Assistant District Attorney Zamzok that branch of defendant’s motion seeking to suppress his three post -Miranda statements is denied. (See, People v Witherspoon, 66 NY2d 973, 974 [1985]; People v Anderson, 42 NY2d 35, 38 [1977]; People v Huntley, 15 NY2d 72, 78 [1965].) The statements are admissible pursuant to CPL 60.45.
The evidence adduced established that defendant comprehended and intelligently waived his constitutional rights. Detective Lugo, who is fluent in Spanish, advised defendant of his rights in Spanish and defendant responsively stated after each question that he understood what had been said, and then acknowledged that he wished to speak with the police. The fact that defendant was calm, coherent and responsive further supports the conclusion that defendant knowingly and voluntarily waived his right against self-incrimination.
Since defendant had been appropriately advised of his constitutional rights prior to making the oral and written statements to Detective Lugo, there was no need to reiterate the same rights to him before the videotaped statement was made. (See, People v Johnson, 49 AD2d 663, 664-665 [3d Dept 1975], affd 40 NY2d 882 [1976].) Consistent with the professionalism and caution exhibited in the prior phases of the investigation, the law enforcement officials nonetheless chose to readvise defendant of his rights. The minor discrepancies in translation cited by the defendant are inconsequential and do not invalidate the sufficiency of the warnings, since there is no need to mouth a ritualistic formula so long as the words used, as here, conveyed the substance of the Miranda rights with all *203 the requisite knowledge. (See, People v Lewis, 163 AD2d 328 [2d Dept 1990]; People v Jordan, 110 AD2d 855 [2d Dept 1985].) Observation of defendant’s calm demeanor and cooperative manner as memorialized on the videotape further support the finding of voluntariness beyond a reasonable doubt.

The Physical Evidence Was Lawfully Seized

Since the People have met their initial burden of going forward to show the legality of the police conduct in the first instance, and the defendant has not established the over-all burden of proving the illegality of the search and seizure, the motion to suppress physical evidence is denied in all respects. (See, People v Pettinato, 69 NY2d 653, 654 [1986]; People v Di Stefano, 38 NY2d 640, 653 [1976]; People v Berrios, 28 NY2d 361, 367 [1971].) As noted previously defendant was lawfully arrested. Therefore, the subsequently acquired items are not suppressible under a "fruit of the poisonous tree” doctrine. Correspondingly, the seizure of defendant’s shoes and clothing was proper as incident to a lawful arrest. (See, Chimel v California, 395 US 752, 762-763 [1969]; Henry v United States, 361 US 98, 102 [1959]; People v De Santis, 46 NY2d 82, 87 [1978], cert denied 443 US 912 [1979]; People v Saglimbeni, 95 AD2d, supra, at 144.)
Moreover, the People have met their burden of establishing that defendant consented to the taking of his shoes in the station house as well as the items in his room. After ascertaining defendant’s willingness to consent to the seizure of the shoes at the precinct and the radio cassette player at 31 Buchanan Place, Detective Lugo wrote out a consent form in English and in Spanish. Since no threats or promises were made, and there is no evidence of overbearing police conduct, this court finds that defendant’s consent was given voluntarily. Although defendant was under arrest, that circumstance alone is insufficient to infer coercion. (See, United States v Watson, 423 US 411, 424 [1976]; People v Gonzalez, 39 NY2d, supra, at 128; People v Estrella, 160 AD2d 250, 251 [1st Dept 1990].) Hence, defendant’s motion to suppress physical evidence is denied.
Since defendant voluntarily consented to the seizure of property from his apartment, no search warrant need have been obtained. The police nonetheless decided to procure one and this court finds that the warrant was properly issued and executed. There was sufficient evidence before the issuing *204 Judge to support the determination that there was probable cause to believe that the articles set forth in the warrant could be found at the specified address. Therefore, the warrant was valid. (See, generally, People v P. J. Video, 68 NY2d 296 [1986], cert denied 479 US 1091 [1987].) Detective Moroney’s failure to inform the issuing court that defendant’s statement made in his presence was in a language he did not understand does not vitiate the warrant’s validity. Defendant fails to demonstrate that this omission was made knowingly or with reckless disregard for the truth since the statement was simultaneously translated into English by Detective Lugo. (See, Franks v Delaware, 438 US 154, 171-172 [1978]; People v Tambe, 71 NY2d 492, 504-505 [1988].) Notably, an arresting officer acts with probable cause when he relies on information conveyed by a fellow officer. (See, People v Brnja, 50 NY2d 366, 372 [1980].)
CONCLUSION
For the foregoing reasons, this court finds that the police conduct was lawful and defendant’s constitutional rights were not violated. The court finds beyond a reasonable doubt that defendant’s initial admission was a spontaneous noncustodial statement and his subsequent confessions were voluntarily given after defendant was properly advised of his Miranda rights. The court finds this to be so beyond a reasonable doubt. Finally, this court finds that the physical evidence seized was taken pursuant to a lawful arrest (black shoes and clothing), a valid consent (black shoes and radio cassette player) and a valid search warrant (carry bag and its contents, including a cassette recorder). Therefore the People have sustained their burden in all respects and the defendant’s motion to suppress statements and the physical evidence seized is denied in all respects.

. Specifically, defendant seeks to suppress the hat, sweater, socks, pants, undershorts, windbreaker, jacket, lip balm, sunglasses, comb, house keys and black shoes which were taken from him at the station house, and the red carry bag, cassette player, headphones and tapes which were removed from his apartment.

. The court wishes to acknowledge the bravery of these three police veterans who went to the door of a suspect who might very well have been responsible for the deaths of 87 men and women without bullet proof vests and with guns bolstered. They conducted this investigation in the best tradition of New York City’s Finest.

. Even though it is not necessary to reach this conclusion, I wish to note parenthetically that before the defendant left his room, the police had probable cause to arrest the defendant. While in the room the police consensually entered they detected a strong odor of gasoline, an accelerant, a substance rarely found in one’s dwelling. They found the odor to emanate from the defendant’s shoes and additionally discovered, in open view, a *201 carry bag, an article described as having been worn by the person who purchased one dollar’s worth of gasoline at the AMOCO gas station shortly before the Happy Land fire. These additional facts taken together with those facts already hereinbefore mentioned in this opinion established probable cause to arrest the defendant. The fact that one has probable cause to make an arrest does not necessarily trigger an arrest. (See, United States v Lovasco, 431 US 783 [1977].) Members of the United States Supreme Court may very well disagree as to what constitutes probable cause. The police showed caution in not being precipitous. They followed the safe path of having the defendant remain noncustodial until such time as he blurted out his incriminating statement at which time they knew with certainty that they had the right to place him in custody.

. Defendant complains that the warnings were rendered fatally defective since the interpreter used the word which means either "belong,” "become,” or "behave” instead of a right to "remain” silent, and that he was instructed that what he said could be used "by the laws of the court” rather than that statement could be used "against” him in a court of law. In both instances, a difference which the court finds to be of no significance.